IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER HUGHES, | No. C-04-0267 MMC |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; VACATING HEARING** |
| v. | |
| ANTHONY J. PRINCIPI, Secretary, Department of Veterans Affairs, | (Docket No. 13) |
| Defendant. | |

Before the Court is the motion for summary judgment filed March 11, 2005 by defendant Anthony J. Principi, Secretary, Department of Veterans Affairs. Plaintiff Alexander Hughes ("Hughes") has filed timely opposition, to which Principi has replied. Having reviewed the papers filed in support of and in opposition to the motion, the Court finds the matter appropriate for decision without oral argument, see Civil L.R. 7-1(b), and hereby VACATES the April 15, 2005 hearing. For the reasons set forth below, the motion is GRANTED.

## BACKGROUND

Hughes, who is African-American, began work on December 16, 2001 as a registered nurse for the Department of Veterans Affairs Medical Center in San Francisco, California ("VA"), (see Compl. ¶¶ 1-2), and was terminated approximately eight months later, on August 9, 2002, (see id. ¶ 3). Hughes alleges he was terminated because of his race, in violation of

1  Title VII of the Civil Rights Act of 1964 ("Title VII"), (see id. ¶¶ 26-29), and that Linda Adams
2  ("Adams"), his supervisor, created a hostile working environment, in violation of Title VII, by
3  making repeated "insensitive, unsolicited, and derogatory comments" related to his race, (see
4  id. ¶¶ 20-21).

5        The following is a summary of the relevant evidence:

6        **A. Inquiry About Inlaws**

7        In his sworn responses to interrogatories, dated July 19, 2004, Hughes stated that his
8  wife is a Caucasian of German national origin, that Adams had met her, and that on one
9  occasion "[Adams] asked [him] in about April or May 2002 whether his wife's family had
10 'accepted' him because of his race." (See Duggan Decl. Ex. P1 at 3:17-19.) Hughes states
11 he "made known" to Adams that he found the question offensive. (See id. at 3:19-22.)
12 According to Hughes, Adams, "thereafter," became "pointed in her hostility towards him."
13 (See id.) On February 5, 2005, at his deposition, Hughes testified that Adams asked him,
14 "how do your inlaws get along with you" or how do they "receive you"? (See Cheng Decl., Ex.
15 C (Hughes Dep.) At 47:11-17.) Hughes further testified that he "was a little upset about that,"
16 and "kind of ignored the question . . . and just walked [out of the room]." (See id. at 47:19-23.)
17 According to Hughes, Adams knew that his wife was German, (see id. at 48:21-23); he further
18 testified that Adams said nothing else about his inlaws, (see id. at 47:23-48:2).

19       Adams testified that the above-described conversation occurred in the context of
20 Hughes' request for more than the maximum amount of vacation time the VA generally
21 permitted unless an employee was planning to leave the country. (See id. at 78:4-12.)
22 Adams testified Hughes told her that he was going to Germany, (see id. at 78:9-16); Adams
23 speaks German and has traveled to Germany, (see id. at 78:17-18). She further testified that
24 when she learned Hughes was going to Germany, she said: "Oh, the German people are so
25 accepting of Americans who speak German. They love it when you speak their language to
26 them. Don't you find that your in-laws are that way?" (See id. at 78:17-21.) When asked at
27 deposition whether she ever asked Hughes how his German Caucasian inlaws "dealt with the
28 fact that he is an African American and whether or not that bothered him," Adams responded,

1  "No." (See id. at 79:8-20.)

2  **B. Meeting with Powell and Comments About Hair**

3  Hughes testified at deposition that Adams pulled him aside one day and said that she
4  would set up an appointment for him with Garfield Powell ("Powell"), the VA nursing educator,
5  to "counsel [Hughes] about how patients might perceive [him]." (See id. at 53:2-9; see also
6  Cheng Reply Decl. Ex. A (Hughes Dep.) at 52:16-18.) Hughes testified that Adams did not
7  say anything else and that her comment was not specific to his appearance. (See id. Cheng
8  Decl., Ex. C (Hughes Dep.) at 53:10-13.)

9  Adams testified at deposition that she arranged the meeting with Powell because she
10 and Hughes "agreed . . . that he would like help on how his patients were perceiving him."
11 (See Duggan Decl. Ex. P2 (Adams Dep.) at 69:14-20.) Adams testified that the discussion
12 was prompted by her receipt from patients of complaints about Hughes. (See id. at 71:4-20.)
13 Adams further testified that Hughes told her "that those interactions had, in fact, happened,
14 and that he felt very much misunderstood by the patients." (See id. at 71:12-14.)

15 Hughes testified at deposition that Powell, who is African-American, made an
16 unspecified comment during his meeting with Hughes, suggesting that Hughes "should look a
17 certain way." (See Cheng Decl., Ex. C (Hughes Dep.) at 53:10-13.) id. at 54:2-20.) In his
18 prior sworn interrogatory responses, Hughes stated that Powell had suggested that he wear a
19 cap. (See Duggan Decl. Ex. P1 at 4:1-2.) At the time of his meeting with Powell, Hughes'
20 hair "was starting to become a little dreadlocked" but, according to Hughes, was not
21 "offensively dreadlocked." (See id. Cheng Decl., Ex. C (Hughes Dep.) at 53:10-13.) Hughes
22 testified that he does not believe that Powell was discriminating against him because of his
23 race. (See id. at 54:3-9.)

24 In Hughes' sworn responses to interrogatories, he stated that, "[o]n several occasions,"
25 Adams "adversely commented" on his hair style, by describing it as "'Rastafarian'
26 dreadlocks," that she asked Powell to speak to Hughes about his appearance and how he
27 was perceived by patients, and that she subsequently made "rude comments about his
28 appearance and its association for her with African-American culture and 'druggies.'" (See

3

Duggan Decl. Ex. P1 at 3:23-4:7.) Thereafter, at his deposition, Hughes testified that Adams never made a comment to him about his hair. (See Cheng Reply Decl. Ex. A (Hughes Dep.) at 52:20-22.) Adams similarly testified at her deposition that she never expressed a concern to Hughes about how he wore his hair, that she had no concern about it, and that she never had a concern that Hughes' appearance was unprofessional in any way. (See Cheng Decl. Ex. D (Adams Dep.) at 72:6-20.)

### C. Inquiry About Drug and Alcohol Usage

In his sworn responses to interrogatories, Hughes attests that in May 2002, Adams called him into her office and asked him if he was on drugs or intoxicated by alcohol. (See Duggan Decl. Ex. P1 at 4:8-11.) According to Hughes, Adams stated that his eyes were red, and "[w]hen he tried to deny it, she claimed the facility had an excellent 'rehabilitation' program." (See id.) Hughes attests that he found these remarks offensive, and told Adams so. (See id.)

Adams testified that she was concerned that Hughes may have been under the influence of alcohol or drugs because he had bloodshot eyes, he demonstrated an "inability to stay awake during report," and had a "pattern of leave usage on Sundays." (See id. Ex. P2 at 72:21-73:9.) Adams testified that she asked Hughes if he had any problem that he wanted to discuss, Hughes "said no," and, in her view, "[t]hat was the end of it," (see id. at 73:10-13, 80:12-20), Hughes, however, "kept going on and on about his appearance and stereotyping." (see id. at 73:13-14).

### D. Unspecified Comments

Hughes attests, without further specification, that Adams "made insensitive, unsolicited, and derogatory comments related to [his] race on April 15, 18, May 16, 17, 22, 28, June 12 and 18, 2002." (See Duggan Decl. Ex. P1 at 4:21-23.)

### E. Reasons for Termination

At all times during his employment with the VA, Hughes was a temporary employee. (See Cheng Decl. Ex. D (Adams Dep.) at 17:16-18:7.) Registered nurses at the VA must go

1  through a two-year probationary period, and have their file "acted on by the Nurse
2  Professional Standards Board" before they become permanent employees.  (See id. at
3  17:12-24.)
4      Adams' memorandum recommending that Hughes be terminated sets forth the
5  following reasons for termination:
6      1.  There were five patient complaints about Hughes during his roughly eight months of
7  employment with the VA.
8      2.  Adams observed a "heated discussion" between Hughes and his preceptor, John
9  Tuvo ("Tuvo"), and "inappropriate behavior" directed by Hughes towards Tuvo.
10     3.  It was reported to Adams on July 17, 2002 that Hughes had called another nurse a
11 "bitch," and that Hughes stated that he had actually used the word "witch."
12     4.  That same day, a patient reported that he was "very traumatized" by a morning
13 discussion with Hughes and that Hughes had admitted raising his voice and pointing a finger
14 at the patient.
15     5.  Hughes had attendance problems.
16     6.  Hughes had "not managed to change his behaviors despite many attempts to guide
17 him and help him to progress professionally."
18 (See Cheng Decl. Ex. E; see also Duggan Decl. Ex. P2 (Adams Dep.) at 55:21-56:4 and Ex.
19 4.)
20     Hughes submits no evidence disputing the number of complaints about Hughes
21 received from patients.
22     With respect to the confrontation between Hughes and Tuvo, Hughes attests, in a sworn
23 interrogatory response, that the "disagreement" was initiated by Tuvo, and that he and Tuvo
24 quickly reconciled their differences.  (See Duggan Decl. Ex. P1 at 2:27-3:4.)[1]  Adams testified
25 at deposition that she witnessed Hughes and Tuvo having a "very heated discussion," and that
26
27     [1] In his responses to interrogatories, Hughes also refers to certain documents that have not been submitted to the Court.  The Court thus disregards, as inadmissible hearsay, any
28 statements in Hughes' interrogatory responses about the content of such documents.

5

she thought it was "not appropriate [for such a discussion] to be taking place in an open hallway where patients could be hearing." (See Duggan Decl. Ex. P2 at 87:13-88:6.)  Adams acknowledged at deposition that Tuvo and Hughes resolved their differences in her presence. (See id. at 88:7-24.)  She further testified that she gave both Tuvo and Hughes "verbal feedback that it's not okay to carry on like that in a public place." (See id. at 88:25-89:3.)

Alan Chan ("Chan") testified at deposition that the incident with Tuvo and Hughes occurred because Chan misunderstood Tuvo's instruction to move a patient to another room. (See Duggan Decl. Ex. P3 (Chan Dep.) at 24:23-25:19.)  Chan moved the patient to the wrong room, and Tuvo "got a little upset." (See id. at 25:4-8.)  According to Chan, Hughes, who was Chan's Team Leader, told Tuvo there was no need to get upset, because he and Chan would transfer the patient to the correct room.  (See id. at 25:9-15, 25:20-22, 32:3-25.)  Chan testified that "everybody went [ ] their separate ways after about five minutes of argument." (See id. at 25:16-19.)[2]

With respect to the July 17, 2002 incident in which Hughes purportedly referred to a co-worker, Helen Curran ("Curran"), as a "bitch," Hughes denies, in a sworn interrogatory response, that he did so.  (See Duggan Decl. Ex. P1 at 2:19-21.)[3]  Adams testified at deposition that Hughes told her that he called Curran a "witch," (see Duggan Decl. Ex. P2 at 90:10-15), and Hughes submits no evidence to the contrary.  At deposition, Adams testified that she could believe Hughes had actually called Curran a "witch," but that "it was still not an appropriate thing to do, any kind of name calling." (See id. at 90:19-22.)

With respect to the July 17, 2002 incident involving the "traumatized" patient, Hughes

---

[2] It is not clear from the evidence submitted where Adams was situated at the time she became aware of the encounter.  According to Chan, Adams was "not present." (See id. at 34:9-12.)  As described by Chan, however, the argument was "a loud shouting match," (see id. at 38:18), in which Hughes and Tuvo "both were yelling," (see id. at 38:24).  As such, it presumably could be heard from some distance.  In any event, it is undisputed that such an argument occurred and that Adams met with both participants thereafter.

[3] Although Hughes, in that response, refers to documents in which witnesses to the incident purportedly denied hearing Hughes call the co-worker a "bitch," those documents have not been submitted to the Court.

6

1  testified under oath before the Department of Veterans Affairs that the patient in question had
2  told him that he "should do everything for [the patient]" to accommodate [him], even it means
3  kissing [the patient's] ass." (See Cheng Reply Decl. Ex. B at 14:17-20.) Hughes further
4  testified that he told the patient: "I'm certainly not going to kiss your butt." (See id. at 14:21-
5  22.)  In his sworn responses to interrogatories, Hughes reiterates this account, and
6  acknowledges that he responded to the patient with "irritation." (See Duggan Decl. Ex. P1 at
7  3:5-12.)

8       Adams testified at deposition that during Hughes' eight months of employment with the
9  VA, he used seven days of sick leave, i.e., called in sick, (see Duggan Decl. Ex. P2 at 96:13-
10 97:25), and, as noted above, had a "pattern" of using sick leave on Sundays, (see id. At 72:9).
11 Hughes submits no evidence disputing these attendance problems.

12      Adams recommended to the Human Resources Department ("HR"), that Hughes'
13 employment be terminated; shortly thereafter, Adams received approval for Hughes'
14 termination. (See Duggan Decl. Ex. P2 (Adams Dep.) at 33:8-22.) Adams testified that she
15 believes HR personnel spoke to her supervisor, Lynda Ray, about the proposed termination,
16 but was not aware whether they spoke to anyone else, or reviewed anything other than her
17 written recommendation and Hughes' personnel file, prior to approving his termination. (See
18 id. at 34:4-22, 37:2-6.)

19      On July 24, 2002, Adams personally handed Hughes a letter terminating his
20 employment. (See Duggan Decl. Ex. P2 at 54:1-24.) The letter was signed by Marie Boland,
21 Chief, Human Resources Management Service, and informed Hughes that he was being
22 terminated as of August 9, 2002 for the following reasons: "[Y]our interactions with patients
23 and other staff have been disruptive to the work unit and contrary to the best interests of our
24 patients, i.e., you called another nurse a "bitch" or "witch", you acted disrespectfully toward
25 your charge nurse, and you yelled and pointed your finger at a patient saying, "I am not here to
26 take care of your mental problems or to kiss your ass." (See id. and Ex. 3.)

27      Hughes attests that at all times while working for the VA, he performed his duties in a
28 professional competent manner and met or exceeded all standards of performance.  (See id.

at 4:17-20.) Chan attests that he observed Hughes interacting with patients and found his interactions to be very polite and courteous. (See Duggan Decl. Ex. P3 at 31:1-3.) Chan opined that Hughes' performance was "adequate and very professional as a Registered Nurse." (See id. at 31:4-6.)

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment as to "all or any part" of a claim "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(b), (c). Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. See id. The Court may not weigh the evidence. See id. at 255. Rather, the nonmoving party's evidence must be believed and "all justifiable inferences must be drawn in [the nonmovant's] favor." See United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (citing Liberty Lobby, 477 U.S. at 255).

The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party will bear the burden of proof at trial, the moving party's burden is discharged when it shows the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325.

Where the moving party "bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial." See Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (citations omitted); see also Fontenot v. Upjohn, 780 F.2d 1190, 1194 (5th Cir. 1986) (holding when plaintiff moves for

1 summary judgment on an issue upon which he bears the burden of proof, "he must establish
2 beyond peradventure <u>all</u> of the essential elements of the claim . . . to warrant judgment in his
3 favor.") (emphasis in original).

4      A party opposing a properly supported motion for summary judgment "may not rest
5 upon the mere allegations or denials of [that] party's pleading, but . . .  must set forth specific
6 facts showing that there is a genuine issue for trial."  <u>See</u> Fed. R. Civ. P. 56(e); <u>see also</u>
7 <u>Liberty Lobby</u>, 477 U.S. at 250.  The opposing party need not show that the issue will be
8 resolved conclusively in its favor.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248-49.  All that is
9 necessary is submission of sufficient evidence to create a material factual dispute, thereby
10 requiring a jury or judge to resolve the parties' differing versions of the truth at trial.  <u>See</u> <u>id</u>.

11 **DISCUSSION**

12      At his deposition, Hughes testified that Adams was the only person at the VA who
13 discriminated against him, and that she also was the only person who created a hostile
14 working environment.  (<u>See</u> Cheng Decl., Ex. C (Hughes Dep.) at 31:11-32:11.)

15      **A.  Race Discrimination – Title VII**

16      Under the familiar burden-shifting scheme first set forth in <u>McDonell Douglas Corp. v.</u>
17 <u>Green</u>, 411 U.S. 792, 802 (1973), a plaintiff may establish a <u>prima</u> <u>facie</u> case of race
18 discrimination by showing "(1) he is a member of a protected class; (2) he was qualified for
19 his position; (3) he experienced an adverse employment action; and (4) similarly situated
20 individuals outside his protected class were treated more favorably, or other circumstances
21 surrounding the adverse employment action give rise to an inference of discrimination."  <u>See</u>
22 <u>Fonseca v. Sysgo Food Services of Arizona, Inc.</u>, 374 F.3d 840, 847 (9th Cir. 2004).  The
23 requisite degree of proof necessary to establish a <u>prima</u> <u>facie</u> case of discrimination is
24 minimal; a plaintiff need only offer admissible evidence that gives rise to an inference of
25 unlawful discrimination.  <u>See</u> <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 889 (9th Cir. 1994).

26      Establishment of a <u>prima</u> <u>facie</u> case creates, in effect, a presumption that the employer
27 unlawfully discriminated against the employee.  <u>See</u> <u>Texas Dep't of Community Affairs v.</u>
28 <u>Burdine</u>, 450 U.S. 248, 254 (1981).  If a plaintiff establishes a <u>prima</u> <u>facie</u> case of racial

9

1  discrimination, the burden then shifts to the defendant to articulate a legitimate,
2  nondiscriminatory reason for the employee's rejection.  See McDonnell Douglas, 411 U.S. at
3  802; see also Fonseca, 374 F.3d at 849.  The defendant must produce admissible evidence
4  of the reasons for the plaintiff's rejection sufficient to create a genuine issue of fact as to
5  whether they discriminated against plaintiff.  See Burdine, 450 U.S. at 254-55.   In other
6  words, the defendant must submit evidence which, taken as true, would permit the conclusion
7  that there was a nondiscriminatory reason for its actions.  See St. Mary's Honor Center v.
8  Hicks, 509 U.S. 502, 509 (1993).  If the defendant does so, the presumption raised by the
9  prima facie case is rebutted and disappears.  See Burdine, 450 U.S. at 255.

10  Once a defendant has articulated a legitimate, non-discriminatory reason for the
11  employee's termination, the plaintiff must show the defendant's proffered reason was a pretext
12  for discrimination.  See McDonnell Douglas, 411 U.S. at 804.  "A plaintiff can prove pretext
13  either (1) indirectly, by showing that the employer's proffered explanation is unworthy of
14  credence because it is internally inconsistent or otherwise not believable, or (2) directly, by
15  showing that unlawful discrimination more likely motivated the employer."  See Fonseca, 374
16  F.3d at 849 (internal quotation and citation omitted).  "The ultimate burden of persuading the
17  trier of fact that the defendant intentionally discriminated against the plaintiff remains at all
18  times with the plaintiff."  Burdine, 450 U.S. at 253.

19  The Supreme Court has noted, however, that the McDonnell Douglas framework
20  described above "does not apply in every employment discrimination case."  See
21  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002).  "For instance, if a plaintiff is able to
22  produce direct evidence of discrimination, he may prevail without proving all the elements of a
23  prima facie case."  Id. (citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985)).
24  Additionally, the Ninth Circuit has held that "although the McDonnell Douglas burden shifting
25  framework is a useful tool to assist plaintiffs at the summary judgment stage so that they may
26  reach trial, nothing compels the parties to invoke the McDonell Douglas presumption."  See
27  McGinest v. GTE Service Corp., 360 F.3d 1103, 1122 (9th Cir. 2004) (internal quotations
28  omitted).  "Rather, when responding to a summary judgment motion, the plaintiff is presented

1  with a choice regarding how to establish his or her case" and "may proceed by using the
2  McDonnell Douglas framework, or alternatively, may simply produce direct or circumstantial
3  evidence demonstrating that a discriminatory reason more likely than not motivated" the
4  defendant. See id. Under either approach, the plaintiff must "produce some evidence"
5  suggesting that the adverse employment action "was due in part or whole to discriminatory
6  intent." See id. at 1123.

7       In the instant case, Hughes, relying on McGinest, argues that he is not required to
8  oppose defendant's motion under the McDonnell Douglas framework, "but can instead
9  oppose by presenting other direct and/or circumstantial evidence of discriminatory intent[.]"
10 (See Opp. at 2.) Here, as in McGinest, however, there is no meaningful difference between
11 the two approaches. See McGinest, 360 F.3d at 1123 (discussing plaintiff's option to oppose
12 motion for summary judgment by either using the McDonnell Douglas framework or by
13 producing direct or circumstantial evidence of discriminatory intent; noting "[u]nder either
14 approach, McGinest must produce some evidence suggesting that GTE's failure to promote
15 him was due in part or whole to discriminatory intent, and so must counter GTE's
16 explanation[.]"). Assuming, arguendo, Hughes has established a prima facie case of
17 discrimination under McDonnell Douglas, defendant has met its burden of setting forth
18 evidence of a legitimate, nondiscriminatory reason for Hughes' termination, in particular, that
19 Hughes was terminated because of repeated complaints from patients, his argument with
20 Tuvo, a report that he called another co-worker a "bitch" or "witch," and attendance problems.
21 (See Cheng Decl. Ex. E; see also Duggan Decl. Ex. P2 (Adams Dep.) at 55:21-56:4 and Ex.
22 4.) Thus, Hughes must counter defendant's explanation and produce some evidence that the
23 decision to terminate him was due in whole or in part to discriminatory intent. See McGinest,
24 360 F.3d at 1123.

25      As noted above, Hughes relies on evidence of several prior incidents involving Adams,
26 which he contends demonstrates her racial animus. In the first incident, according to Hughes,
27 Adams asked him whether his inlaws "had 'accepted' him because of his race." (See
28 Duggan Decl. Ex. P1 at 3:17-22.) It is unclear from this interrogatory response whether

Hughes is stating Adams used the phrase "because of your race" or whether Hughes is merely drawing that inference. (See Cheng Decl. Ex. C (Hughes Dep.) at 47:11-48:23.) At his deposition, however, when Hughes specifically was asked for the "comment" Adams made, he answered: "Somewhat to the effect - - effect that, you know, how do your in-laws receive you, you know, how do your in-laws get along with you." Even assuming, for purposes of the instant motion, that Adams asked Hughes whether his inlaws accepted him because of his race, however, such a comment, while arguably "politically incorrect," does not give rise to an inference of race-based animus.

With respect to the second incident, Hughes, as noted, attests that Adams called Hughes into her office, observed that his eyes were red, and asked Hughes if he was on drugs or intoxicated by alcohol. (See Duggan Decl. Ex. P1 at 4:8-11.) According to Hughes, Adams informed him that the VA had an excellent rehabilitation program. (See id.) Nothing about this comment suggests that it was made because of Hughes' race.

Hughes also attests, in his responses to interrogatories, that Adams made certain comments about his hair that demonstrate racial animus. First, Hughes states that on several occasions, Adams "adversely commented" on Hughes' hairstyle,"describ[ing] it as 'Rastafarian' dreadlocks." (See Duggan Decl. Ex. P1 at 3:23-24.) Although Hughes states his hairstyle "met all the standards of hygiene," (see id.), any disagreement on Adams' part as to its propriety for medical personnel does not permit an inference of bias against Hughes because of his race. Similarly, Adams' referral of Hughes to Powell for a discussion of how Hughes "was perceived by patients based on his appearance," (see Duggan Decl. Ex. P1 at 3:23-24), does not permit an inference of racial animus. Lastly, Hughes attests in his responses to interrogatories that when he "continued to wear his hair in a style she found inappropriate, [ ] Adams made rude comments about his appearance and its association for her with African-American culture and 'druggies.'" (See Duggan Decl. Ex. P1 at 4:5-7.) Again, Hughes' statement is ambiguous. The "rude comments" are not set forth, and, consequently, it is unclear whether Hughes is simply drawing an inference that Adams' remarks constituted a commentary on African-American culture. Hughes offers insufficient evidence that the

unspecified "rude comments" about Hughes' appearance, or any comment that she associated Hughes' hairstyle with "druggies," were race-based.[4]

In summary, Hughes has submitted, at most, evidence of a few comments over the course of his employment, none of which, either singly or in combination, gives rise to an inference of racial animus. Rather such evidence is of the type the Ninth Circuit has held insufficient to survive summary judgment. See, e.g., Nesbit v. Pepsico, Inc., 994 F.2d 703 (9th Cir. 1993) (finding no triable issue as to age discrimination despite evidence that plaintiff's direct supervisor stated to plaintiff "[w]e don't necessarily like grey hair"; noting statement was made in "ambivalent manner and was not tied directly to [plaintiff's] termination"); see also Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (holding evidence of "stray remarks . . . unrelated to the decisional process" insufficient to survive summary judgment on employment discrimination claim even when made by decisionmaker).

This finding does not end the analysis, however, as Hughes also challenges, as pretextual, the reasons given for his termination. With respect to patient complaints against him, Hughes argues that his Disciplinary Action Activity Log reflects that he received a total of only two complaints in February and March, and that he did not receive another complaint until July. (See Duggan Decl Ex. P2 (Adams Dep.) Ex. 5.) In fact, the log states, in the entry for March, "3 more complaints received." (See id.) Thus, the log shows five patient complaints (one in February, three in March, and one in July), the same number set forth in Adams' memorandum recommending Hughes' termination. (See Cheng Decl. Ex. E.)

With respect to the incident with Tuvo, Hughes contends that the argument was initiated

---

[4] Although, for purposes of the instant motion, the Court assumes Adams made remarks about Hughes' hairstyle, the Court notes that Hughes contradicted his responses to interrogatories by flatly denying at deposition that Adams ever made any comments to him about his hair. (See Cheng Reply Decl. Ex. A (Hughes Dep.) at 52:20-22.) At deposition, Hughes testified that although Powell and "other nurses" made comments about his hair, Adams did not do so. (See Cheng Reply Decl. Ex. A (Hughes Dep.) at 52:3-22; Cheng Decl. Ex. C (Hughes Dep.) at 53:16-54:25.) Indeed, Hughes testified repeatedly that the only purportedly race-based comments Adams ever made to him were (1) the inquiry about his inlaws, and (2) her inquiry about his bloodshot eyes. (See Cheng Reply Decl. Ex. A (Hughes Dep.) at 52:3-25, 56:2-12; Cheng Decl. Ex. C (Hughes Dep.) at 53:1-54:1.)

by Tuvo, but that Tuvo, who is white, was not terminated or disciplined.  (See Duggan Decl. Ex. P3 (Chan Dep.) at 24:4-25:19, 36:12-20, 39:2-4.)  Hughes has not demonstrated, however, that he and Tuvo were "similarly situated."  See, e.g., Fonseca, 374 F.3d at 847.  Adams testified that she did not note the incident on a Disciplinary Action Activity Log for Tuvo because he "was not in [a] corrective disciplinary plan" and therefore did not have such a log, and that she did not create such a log for him because the incident was an isolated event in Tuvo's career.  (See Duggan Decl. Ex. P2 (Adams Dep.) at 89:2-90:2.)  Moreover, Hughes does not dispute that Adams gave both Hughes and Tuvo "verbal feedback that it's not okay to carry on like that in a public place."  See id. at 88:25-89:3.)[5]  Lastly, defendant does not contend that Hughes was terminated solely as a result of his argument with Tuvo, but as a result of various incidents during the course of his employment.  As there is no evidence that Tuvo, or any other employee for that matter, was involved in a similar constellation of incidents, Hughes has not raised a triable issue as to whether he and any similarly-situated employee were treated differently.

With respect to the "bitch"/"witch" comment, Hughes points out that several witnesses were unable to hear the remark, and that Hughes has denied calling his co-worker a "bitch." (See Duggan Decl. Ex. P1 at 2:19-21.)  Hughes does not dispute, however, Adams' testimony that Hughes admitted he called Curran a "witch," (see Duggan Decl. Ex. P2 (Adams Dep.) at 90:10-15), or that Adams' memorandum recommending Hughes' termination specifically noted that Hughes told her he called Curran a "witch."  (See Cheng Decl. Ex. E.)  Nothing in that recommendation indicates any conclusion by Adams as to which word Hughes used to describe his co-worker, or that it made a difference to anyone involved in Hughes' termination whether the word "bitch" or "witch" was used.  Indeed, Adams testified at deposition: "I can believe him that it was a witch versus a bitch.  It was still not an appropriate thing to do, any

---

[5] As noted, Hughes was a probationary employee.  To the extent Hughes may be suggesting that pretext may be inferred from an absence of progressive discipline, the evidence is undisputed that Hughes, as a probationary employee, was not entitled thereto. (See Duggan Decl. Ex. P2 (Adams Dep.) At 67:2-17.)

kind of name calling." (See Duggan Decl. Ex. P2 (Adams Dep.) at 90:12-22.)

Similarly, with respect to the above-specified patient complaint, Adams' memorandum recommending Hughes' termination states that when she spoke to Hughes about the patient's complaint, he admitted to raising his voice and pointing his finger at the patient, but did not admit to the comments the patient attributed to him. Hughes concedes, however, that he responded to the patient "in irritation that he was not there to 'kiss his ass.'" (See Duggan Decl. Ex. P1 at 3:6-8.)

Finally, Hughes submits no evidence challenging Adams' statements about his work attendance.

In sum, Hughes has failed to raise a triable issue of material fact as to whether the reasons given for his termination were pretextual. He has presented no evidence that the incidents described in the memorandum recommending his termination occurred in a manner substantially different than as described. He has submitted no evidence that other employees who were similarly situated to himself engaged in similar conduct and were treated more favorably. In short, the undisputed evidence shows that Hughes engaged in unprofessional conduct during his probationary period and was thereafter terminated. There is no evidence from which a reasonable jury could conclude it is more probable than not that Hughes' race was a motivating factor in his termination.

Accordingly, defendants' motion for summary judgment on Hughes' claim that he was terminated because of his race, in violation of Title VII, will be GRANTED.

**B.  Hostile Work Environment – Title VII**

The Ninth Circuit has frequently held that the elements of a hostile work environment claim are: (1) the plaintiff was subjected to verbal or physical conduct of a racial nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. See, e.g., Vasquez v. County of Los Angeles, 349 F.3d 634 (9th Cir. 2004) (citing Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998)). The environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one

1  that the victim in fact did perceive to be so." See Farragher v. City of Boca Raton, 524 U.S.
2  775, 787 (1998) (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  The plaintiff
3  must show that the harassment occurred because of his race.  See Oncale v. Sundowner
4  Offshore Services, Inc., 523 U.S. 75, 81 (1998).  The Court's determination of whether a
5  hostile environment exists requires an examination of the totality of the circumstances,
6  including "'the frequency of the discriminatory conduct; its severity; whether it is physically
7  threatening or humiliating, or a mere offensive utterance; and whether it unreasonably
8  interferes with an employee's work performance.'"  See Farragher, 510 U.S. at 787-88
9  (quoting Harris, 510 U.S. at 23).

10 　　　　Although the Supreme Court has noted that "conduct must be extreme to amount to a
11 change in the terms and conditions of employment," see Farragher, 524 U.S. at 788, it also
12 has held that conduct may create a hostile work environment if it is either "severe or
13 pervasive."  See id. at 786 (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67
14 (1986)) (emphasis added).  Similarly, the Ninth Circuit has held that discriminatory acts that
15 are "not always of a nature that could be identified individually as significant events" may
16 nonetheless be "significant, both as a legal and as a practical matter" in their "cumulative
17 effect."  See Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1108 (9th Cir. 1998).

18 　　　　In the instant case, the evidence shows, at best, a single question by Adams about how
19 he was received by his inlaws, a single inquiry as to whether his bloodshot eyes were a sign of
20 intoxication, and a handful of negative comments by a supervisor and coworkers about his
21 hairstyle.  Such comments, as a matter of law, are insufficient to create a hostile work
22 environment.  See Oncale, 523 U.S. at 80 (noting Title VII does not create "a general civility
23 code for the American workplace"); see also Farragher, 524 U.S. at 788 (noting that "simple
24 teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount
25 to discriminatory changes in the terms and conditions of employment") (internal quotations
26 and citation omitted).

27 　　　　Accordingly, defendant's motion for summary judgment as to Hughes' hostile work
28 environment claim will be GRANTED.

**CONCLUSION**

For the reasons set forth above, defendant's motion for summary judgment is hereby GRANTED in its entirety.

The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: April 18, 2005

/s/ Maxine M. Chesney
MAXINE M. CHESNEY
United States District Judge